UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Ker N.,[1]

Plaintiff,

v.

Kilolo Kijakazi,
Acting Commissioner of Social Security,

Defendant.

Court File No. 21-cv-2222 (KMM/LIB)

**REPORT & RECOMMENDATION**

Plaintiff, Ker N. (hereinafter "Plaintiff"), seeks judicial review of the decision of the Acting Commissioner of Social Security ("Defendant") denying her application for disability benefits. This matter has been referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 405(g).

Both parties submitted cross-motions for summary judgment, and the Court took the matter under advisement on the parties' written submissions. [Docket Nos. 22, 25].

For the reasons discussed herein, the undersigned recommends that Plaintiff's Motion for Summary Judgment, [Docket No. 22], be **DENIED**, and that Defendant's Motion for Summary Judgment, [Docket No. 25], be **GRANTED**.

---

[1] This District has adopted the policy of using only the first name and last initial of any nongovernmental parties in Social Security opinions such as the present Report and Recommendation. Accordingly, where the Court refers to Plaintiff by her name, only her first name and last initial are provided.

## I.  Procedural History

Plaintiff filed a Title II application for a period of disability and disability benefits on April 30, 2019, and an application for supplemental security income on May 22, 2019.  (Tr. 66-67; 76-77).[2]  Plaintiff alleged that her disability began on February 1, 2018, and that her disability was caused by impairments of "heart issues – had heart surgery," "lower back pain," "pain in legs," "trouble walking," and "chest pain."  (Tr. 67).  The Acting Commissioner initially denied Plaintiff's present claims on January 24, 2020, and again, upon reconsideration, on April 22, 2020.  (Tr. 118-122; 130-137).  On May 13, 2020, Plaintiff filed a written request for a hearing before an Administrative Law Judge.  (Tr. 11, 138-139).

Administrative Law Judge Nicholas Grey (hereinafter "ALJ") conducted a hearing on October 27, 2020.  (Tr. 11).  Plaintiff testified at the hearing, and independent vocational expert, Beverly Solyntjes, appeared but did not provide any testimony.  (Tr. 11).  On December 24, 2020, the ALJ issued a decision denying Plaintiff's request for a period of disability and disability insurance benefits, as well as her request for supplemental security income.  (Tr. 11-28).  The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 28).

Thereafter, Plaintiff sought review of the decision by the Appeals Council.  (Tr. 1-7).  Subsequently, on April 10, 2021, the Appeals Council denied Plaintiff's request for review.  (Tr. 1).  Accordingly, the ALJ's decision became the final decision of the Acting Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

---

[2] Throughout this Order, the Court refers to the Administrative Record, [Docket No. 18], by the abbreviation "Tr." The Administrative Record is consecutively paginated across 68 exhibits. (See Administrative Record, [Docket No. 18). Where the Court cites to the Administrative Record, it refers to the page numbers found in the bottom-right corner of these exhibits.

On October 8, 2021, Plaintiff filed the present action. (Compl., [Docket No. 1]). Thereafter, both parties submitted cross-motions for summary judgment, and the Court took the matter under advisement on the written submissions. [Docket Nos. 22, 25].

## II. Standards of Review

### A. Administrative Law Judge's Five-Step Analysis

If a claimant's initial application for disability benefits is denied, she may request reconsideration of the decision. 20 C.F.R. §§ 404.907–404.909. A claimant who is dissatisfied with the reconsidered decision may then obtain administrative review by an administrative law judge ("ALJ"). 42 U.S.C. § 405(b)(1); 20 C.F.R. § 404.929.

To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis. This analysis requires the ALJ to make a series of factual findings regarding the claimant's impairments, residual functional capacity, age, education, and work experience. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992). The Eighth Circuit has described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

### B. Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, she may request review by the Appeals Council; however, the Appeals Council need not grant that request for review. See 20

C.F.R. §§ 404.967-404.982. The decision of the Appeals Council (or, if the request for review is denied by the Appeals Council, then the decision of the ALJ) is final and binding upon the claimant, unless the matter is appealed to federal court within sixty days after notice of the Appeals Council's action. See 42 U.S.C. § 405(g); 20 C.F.R. § 404.981. In this case, the Appeals Council declined to review the ALJ's decision finding that Plaintiff was not disabled. (Tr. 1-5).

### C. Judicial Review

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps. However, judicial review of the Commissioner's decision to deny disability benefits is constrained to a determination of whether the decision is supported by substantial evidence in the record, as a whole. 42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005); Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) ("We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole."). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007); Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). The Court should not reverse the

Commissioner's finding merely because evidence may exist in the administrative record to support the opposite conclusion.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

After balancing the evidence, if it is possible to reach two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm the decision.  Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  Thus, the court will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'"  Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008).  The decision of the ALJ "is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact."  Id.  "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."  Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009) (quotation omitted).

The claimant bears the burden under the Social Security Act of proving that she is disabled.  See 20 C.F.R. § 404.1512(a); Whitman v. Colvin, 762 F.3d 701, 705 (8th Cir. 2014).  Once the claimant has demonstrated she cannot perform prior work due to a disability, the burden then shifts to the Commissioner to show that the claimant retains the residual functional capacity ("RFC") to engage in some other substantial, gainful activity.  Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

**III. Decision Under Review**

Before beginning the five-step disability evaluation process, the ALJ first determined that Plaintiff met the insured status requirement of the Social Security Act through December 31, 2023. (Tr. 14).  This finding is not in dispute.

Thereafter, the ALJ made the following determinations during the five-step disability evaluation process.

At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since February 1, 2018. (Tr. 14). This finding is not in dispute. The Court will refer to the period of time between the date Plaintiff last engaged in substantial gainful activity and the date through which Plaintiff meets the insured status requirement of the Social Security Act as "the adjudicated period."

At step two, the ALJ concluded that Plaintiff had the following severe impairments: coronary artery disease, status post coronary artery bypass grafting, chronic mechanical low back pain, and lumbar degenerative disc disease. (Tr. 14-19). These findings are not in dispute.

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14). Specifically, the ALJ found that Plaintiff did not have any impairment or combination of impairments which met or medically equaled listings 1.04, 4.02, and 4.04. (Tr. 20). Plaintiff does not challenge the ALJ's findings at step three.

At step four, the ALJ made the following RFC determination:

> [T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except frequent climbing of ramps or stairs, frequent climbing of ladders, ropes, or scaffolds, unlimited balancing, frequent stooping, unlimited kneeling, crouching, crawling.

(Tr. 20). Plaintiff challenges this RFC determination made by the ALJ.

In making this RFC determination, the ALJ, considering the record, as a whole, found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms;" however, the ALJ also found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical

evidence and other evidence in the record for the reasons explained in [the ALJ's] decision." (Tr. 21). Plaintiff challenges this credibility finding by the ALJ only as it pertains to her alleged mental health impairments.

Based on that RFC determination, the ALJ found that Plaintiff was able to perform past relevant work as a home attendant. (Tr. 25). Plaintiff challenges this finding.

Accordingly, the ALJ found that Plaintiff was not under a disability, as that term is defined by the Social Security Act, at any time during the adjudicated period. (Tr. 28).

## IV. Analysis

Plaintiff raises three overarching issues on her appeal of the ALJ's decision. First, Plaintiff asserts a catchall argument contending that the ALJ's RFC determination is not supported by substantial evidence due to several purported deficiencies. (Plf.'s Mem., [Docket No. 22], at pp. 3-18). Second, Plaintiff argues that the ALJ erred in finding that she could actually perform her past relevant work as a home attendant and that this work constituted substantial gainful activity. (Id. at pp. 19-24). Lastly, Plaintiff argues that remand back to the Social Security Administration is required because the appointment of Andrew Saul as the Commissioner of Social Security Administration violated the separation of powers. (Id. at pp. 24-25).

The Commissioner contends that she is entitled to summary judgment, arguing that each of Plaintiff's arguments is unavailing, and that ALJ Grey's opinion is supported by substantial evidence in the record as a whole. (Def.'s Mem., [Docket No. 25]).

### A. RFC Determination

Plaintiff argues that, despite well-documented mental impairments in the record and a finding of "mild" mental limitations in step three of the sequential process, the finding that these impairments were non-severe at step two of the sequential process caused a "'ripple effect' of

errors" throughout the rest of the sequential process, such that the RFC failed to include mental limitations, which in turn, resulted in an erroneous determination that Plaintiff was capable of performing her past semi-skilled work as a home attendant. (Plf.'s Mem., [Docket No. 23], at p. 4). In other words, while Plaintiff does not challenge the ALJ's findings in step two of the sequential process, Plaintiff argues that the ALJ should have included mental limitations in the RFC consistent with the limited mental impairments found in step two (and step three) of the sequential process.

In support, Plaintiff points to her medical records from HealthEast, ARMHS services, and Pathways Counseling (which includes notations referencing, among other things, feelings of depression, anxiety, being overwhelmed, and complaints of memory loss). (See Plf.'s Mem., [Docket No. 23], at pp. 6-13; Tr. 338, 347, 354, 357, 360, 361, 364, 366, 368, 377-78, 436, 607, 608, 616, 617, 621, 623, 624, 626, 629, 636, 637, 638, 640, 643, 644-646, 649, 652, 654, 659, 660, 662, 663, 667, 669, 674, 677, 680, 681, 683, 685, 690, 693, 696, 698, 699, 700, 701, 706, 707, 709, 711, 716, 718, 720, 722, 723, 729, 731, 742, 744, 750, 753, 759, 761-764, 770, 771, 773, 775). However, Plaintiff merely highlights selective, subjective evidence, and asks this Court to reevaluate that evidence to reach a different conclusion than that of the ALJ, who considered that same evidence. The Court may not reverse the ALJ simply because substantial evidence may also support an opposite conclusion. See Milam v. Colvin, 794 F.3d 978, 983 (8th Cir. 2015). Nor can the Court substitute its own judgment or findings of fact for those of the ALJ because the Court "must consider evidence that both supports and detracts from the ALJ's decision," and "must affirm the denial of benefits if 'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings.'" (Id.). Such is the present case now before the Court.

Furthermore, Plaintiff's apparent argument is based, in part, on a fundamental misunderstanding of Social Security Rule 96-8p.

In pertinent part, Social Security Ruling 96-8p provides that

[t]he limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at Step 2 and 3 of the sequential evaluation process. The mental residual capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B and C of the mental disorders listing in 12.00 of the Listing of Impairments, and summarized on the PRTF.

SSR 96-8p, 1996 WL 374184, at *4. Here, in the second and third steps of the sequential process, the ALJ found "mild" limitations in Plaintiff's ability to understand, remember, or apply information; her ability to interact with others; her ability to concentrate, persist, or maintain pace; and her ability to adapt or manage herself. (Tr. 15-19). The ALJ then properly noted that these limitations were not Plaintiff's RFC assessment. (Tr. 19).

Plaintiff's argument that the ALJ should have incorporated his Criteria B finding into the RFC is less of an argument that the RFC failed to include the restriction altogether, and more of an argument that the RFC finding should have been more restrictive. However, here again, Plaintiff is essentially asking the Court to independently re-weigh the evidence that the ALJ considered, and then substitute its own conclusions over those of the ALJ; this the Court cannot do under the applicable standard of review. Milam, 794 F.3d at 983; Woolf, 3 F.3d at 1213.

The Court's review of the record shows that the ALJ properly considered, among other things, Plaintiff's subjective complaints, the objective medical records, and the non-examining State Agency consultants' opinions to deny Plaintiff benefits. See Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005) ("The ALJ was entitled to consider all of the evidence in the record."); see also Stormo v. Barnhart; 377 F.3d 801, 807 (8th Cir. 2004) (quotations omitted)

9

("The ALJ should consider all evidence in the record . . . ."). Specifically, prior to her alleged disability beginning on February 1, 2018, Plaintiff reportedly worked as a PCA for her parents in her own home where she did all the cleaning, cooked all the meals, bathed her parents, did their laundry, went shopping, and assisted them from their bed or chairs—up until they both passed away in 2017 and 2018, respectively. (Tr. 11, 21, 208-209, 242, 368, 419). Plaintiff then reportedly stopped working because she suffered an injury to her right leg, suffered injuries to her head resulting in some memory loss, and began experiencing depression due to her parent's death and memories from the Burmese war. (Tr. 21, 268). But she also reported to having stopped working as a PCA because her father, who was her only client a one point, had passed away. (Tr. 377-378, 419).

Plaintiff reported in her Adult Function Reports that she was not talking to others and no longer being social, but she also indicated that she was currently living in a house with her family, she got along well with others, including authority figures, spoke with her family daily, talked on the phone once or twice a week, visited with friends and family once a month, and attended church weekly. (Tr. 22, 269-273; 277-285). Although Plaintiff indicated that she did not know how to handle money or drive, could not read, and needed to have spoken instructions repeated with reminders to complete tasks, she also reported that she did go shopping accompanied by someone else, exercised daily, and listened to music. (Tr. 22, 269-273; 277-285); see e.g., Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997) (finding that the claimant's ability to "dress and bathe herself," and "do homework, cooking, and shopping" contradicted her "testimony regarding the severity of her. . . disability."). Further, at the October 27, 2020, administrative hearing, although Plaintiff testified to experiencing memory issues, the bulk of her testimony, for the most part,

involved details concerning what kind of work she did while caring for her parents and her physical impairments, such as back pain and the need for a cane to ambulate. (Tr. 21; 48-65).

As for medical records, the ALJ noted that follow-up visits with her primary care provider, Dr. James Letts, indicate limited and conservative treatment for her mental impairments. (Tr. 22). For example, on March 26, 2019, Plaintiff appeared for reported memory issues on April 24, 2019, and complained to Dr. Letts about short-term memory loss and difficulty learning and remembering new things. (Tr. 352). It was noted that Plaintiff had a history of major depression, and feeling sadness when thinking of her deceased parents, but that she was receiving regular counseling visits at home and psychotherapy visits with Pathways Counseling. (Tr. 352). Dr. Letts ultimately concluded that her memory loss was likely secondary to depression because recent lab results did not find any cause of memory loss. (Tr. 352). Dr. Letts also counseled Plaintiff to continue taking fluoxetine, and he recommended attending a more intensive counseling program beyond Pathways Counseling sessions. (Tr. 352). However, there is nothing in the record to indicate that Plaintiff actually followed this treatment recommendation. See e.g., Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004); O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003); Gray v. Apfel, 192 F.3d 799, 801 (8th Cir. 1999).

Therapy progress notes from Pathways Counseling indicate that, on April 29, 2019, and thereafter, Plaintiff's mood appeared mildly depressed, but she appeared appropriately dressed, oriented, and denied unusual perceptions or suicidal ideation. (Tr. 624, 627, 633, 636). Plaintiff was also taught techniques to improve her memory retention, practice mindfulness, and organizational skills. (Tr. 625, 626, 629, 634, 638, 640, 643, 644, 646). On June 12, 2019, Plaintiff

reported that these exercises were helping, and she reported wanting to move into an apartment with two of her friends.  (Tr. 642).

That same day, on June 12, 2019, Plaintiff appeared for a follow-up with Dr. Letts and reported that her mood had improved significantly over the past few months with less sadness, feeling more engaged in her daily life, and feeling supported by her family members.  (Tr. 348). On June 26, 2019, Plaintiff reported that she preferred to come into the clinic to get out of the house, that her mood was improving with the prescribed anti-depressant, and that her depression was under control.  (Tr. 347).

On July 22, 2019, Plaintiff reported to her ARHMS provider that she had "good and bad days," reviewing techniques to manage her depressed moods and continuing these exercises in therapy thereafter.  (Tr. 647, 649, 652, 654, 657).  Throughout these sessions, Plaintiff was observed oriented with a positive mood, normal motor behavior, coherent thoughts, and no unusual perceptions, nor suicidal or homicidal ideations.  (Tr. 651, 656, 661, 662).  Plaintiff attended a group therapy session on August 22, 2019, where she expressed feeling happy and sad, and was reportedly still mourning the death of her parents, but she was appropriately engaging with others throughout the session, maintaining regular eye contact with the group and therapists, and appeared highly supportive of the group as a whole.  (Tr. 659).

On September 3, 2019, Plaintiff presented for a follow-up visit with Dr. Letts where it was noted that she had a history of some depression and social isolation but took fluoxetine daily.  (Tr. 338).  Plaintiff reported to Dr. Letts that her mood was slowly improving, finding it helpful to engage in weekly community support groups; she declined counseling or a change in her medications.  (Tr. 338).  About a week later, on September 11, 2019, Plaintiff reported that her mood had improved since starting Fluoxetine and requested to stop using it.  (Tr. 337); see Brown

v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."); see also Hill v. Colvin, 753 F.3d 798, 800 (8th Cir. 2014).  Plaintiff also denied experiencing side effects on fluoxetine (or any other medication).  (Tr. 275, 285).

Throughout her follow-up visits with Dr. Letts, Plaintiff was noted as being well groomed, with normal speech fluency and rate, and while she appeared depressed and tearful at times, she denied suicidal, homicidal, paranoid, or delusional thoughts. (Tr. 349, 354, 359, 378).  Plaintiff also continuously declined home care, although her weekly compliance medication nurse encouraged it.  (Tr. 337, 342, 346, 355).  See Wagner, 499 F.3d at 849 (8th Cir. 2007).  Plaintiff's medication non-compliance was also well documented in the record, and to the extent her non-compliance was attributed to memory issues, it appears that weekly nurse visits addressed this concern.  (Tr. 334, 355, 429, 488, 489, 492, 558, 603).  Lastly, as the ALJ noted, there is nothing in the record to indicate that Plaintiff had any hospitalizations for her mental impairments.  (Tr. 26).

Therefore, the indicated use of such a conservative treatment method by Plaintiff found in the medical records for her depression (and memory issues), as a whole, indicates mental health symptom levels less than the debilitating symptom levels Plaintiff now subjectively alleges, which contributes to the substantial evidence in support of the ALJ's RFC determination.

The RFC is also consistent with the reports of the non-examining State Agency consultants. The State Agency consultants, Dr. Mark Anderson and Dr. Jonathan Katz, provided opinions as to Plaintiff's functional capacity on January 23, 2020, and April 8, 2020. (Tr. 66-86, 89-110).  In those opinions, the State Agency consultants opined that Plaintiff had the functional capacity to perform her past relevant work as a PCA and concluded that Plaintiff was not disabled.  (Tr. 75,

85, 98, 109). The State Agency consultants also opined that, while Plaintiff was limited to lifting and/or carrying 50 pounds occasionally and 25 pounds frequently and limited to standing, walking, and/or sitting for about 6 hours in an 8-hour workday, she was otherwise unlimited in pushing and/or pulling. (Tr. 82-83, 96-97). As to Plaintiff's mental impairments, they found that Plaintiff had "mild" limitations in her ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. (Tr. 71, 95). Dr. Anderson initially opined that while Plaintiff alleged that she suffered from depression, the medical records provided that her symptoms improved after taking fluoxetine, and she appeared well-groomed, with normal fluency and rate of speech, and no suicidal or homicidal ideation. (Tr. 71-72). Dr. Anderson then concluded that Plaintiff's depression was a non-severe impairment. (Tr. 81). At the reconsideration level, Dr. Katz affirmed Dr. Anderson's conclusion, finding, on appeal, that Plaintiff had not alleged any worsening or new impairments. (Tr. 98).

The ALJ found the State Agency consultants' opinions "generally persuasive," specifically finding that their opinions that the Criteria B findings were mild and finding no severe mental impairments remained generally consistent with the record as a whole, which included evidence of "general stable findings, course of treatment, and activities of daily living." (Tr. 24). Further, the ALJ noted that "[t]here [was] no treating or examining medical opinion specifying different functional limitations." (Tr. 24). The ALJ did not err when he relied on the opinions of the non-examining State Agency consultants. See Turpin v. Colvin, 750 F.3d 989, 994 (8th Cir. 2014); Johansen v. Astrue, No. 10-2076 (DWF/SER), 2011 WL 4583831, at *13 (D. Minn. Aug. 15, 2011), report and recommendation adopted by 2011 WL 4583828 (D. Minn. Sept. 30, 2011); Nelson v. Astrue, No. 06-4298 (DWF/SRN), 2008 WL 822157, at *17 (D. Minn. Mar. 26, 2008).

Therefore, to the extent Plaintiff now seeks a finding that there was substantial evidence in the record that might have supported additional RFC limitations and a finding of mental disability contrary to the ALJ's determination, this the Court cannot provide.  See Milam, 794 F.3d at 98; Woolf, 3 F.3d at 1213.

Nor is the Court persuaded by Plaintiff's assertion that, in light of her mental impairments, failing to apply grid rule 203.01 was error or omitting these impairments from the RFC violated Social Security Rule 85-15.  (Plf.'s Mem., [Docket No. 23], at p. 14).  Plaintiff fails to highlight any legal precedent which would require an ALJ to include mental limitations in an RFC assessment merely because some medical evidence exists in the record that would purportedly support such a restriction, or because Plaintiff subjectively claims as much.  Such a requirement would eviscerate the ALJ's function in determining the RFC.  See Cox, 495 F.3d at 619-620 ("Even though the RFC assessment draws from the medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."); Lockwood, 627 Fed. App'x at 577 (8th Cir. 2015) (quoting Cox).

Further, because this case was decided at step four, Plaintiff's argument regarding the application of grid rule 203.01 at step five fails.  The Medical-Vocational Guidelines, commonly known as "the grids," apply only if a claimant cannot perform her past relevant work.  See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a).  The ALJ did not have an obligation to proceed to step five of the sequential evaluation process because, if the ALJ can find that a claimant is disabled or not disabled at any step, then he does not need to proceed to the next step.  See 20 C.F.R. § 404.1520(1)(4).  As such, the ALJ's step four decision by itself provided sufficient support for his decision that Plaintiff was not disabled.  (Tr. 28).

Lastly, as to IVE Solyntjes, who appeared at the October 27, 2020, administrative hearing, but did not provide testimony, Plaintiff argues that the ALJ was obligated to ask IVE Solyntjes how Plaintiff's alleged mental impairments would affect her ability to work. (Plf's Mem., [Docket No. 23], at p. 14). However, as provided above, the ALJ found that Plaintiff's complaints of severe mental limitations were unsupported by the medical records. (Tr. 22). As discussed extensively above, the Court's review of the medical records finds substantial evidence supports the ALJ's finding. See e.g., Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (holding that a hypothetical relied on by the ALJ need only include impairments the ALJ has found credible). Because the ALJ found no severe mental limitations, the ALJ was not required to consult with IVE Solyntjes as to what effect any mental limitations had on her past relevant work.

### B. Past Relevant Work Determination

Plaintiff also contends that remand is required based on the ALJ's "confusing and contradictory findings" as to whether Plaintiff had the ability to perform her past relevant work as a home attendant. (Plf.'s Mem., [Docket No. 23], at pp. 19-24). In support, Plaintiff first asserts that the ALJ inappositely relied on Barnhart v. Thomas, 540 U.S. 20 (2003) to support his "plainly absurd" finding that Plaintiff could actually "perform a job that indisputable no longer exists, in any numbers." (Id. at p. 21). Second, Plaintiff asserts that the ALJ failed to consider additional factors in determining whether any payments made to Plaintiff were a subsidy under 20 C.F.R. § 404.1574. (Id. at pp. 21-22). Lastly, Plaintiff asserts that the ALJ failed to consider whether Plaintiff's past work as a home attendant was done under special conditions or time she spent at work. (Id. at pp. 22-23).

Turning first to the ALJ's determination that Plaintiff could actually perform her past relevant work as home attendant, the Court finds that the ALJ's analysis was not contrary to law.

At step four, the ALJ must determine whether the claimant can still perform her past relevant work. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e). An ALJ compares a claimant's RFC assessment "with the physical and mental demands of [the claimant's] past relevant work." Young v. Astrue, 702 F.3d 489, 491 (8th Cir. 2013); 20 C.F.R. § 404.1520(f).

There are "[t]hree possible tests for determining whether or not a claimant retains the capacity to perform his or her past relevant work." SSR 82-61, 1982 WL 31387, *1 (Jan. 1, 1982). As relevant here, the second test asks "[w]hether the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it." Id. "Under this test, where the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it, the claimant should be found to be 'not disabled.'" Id. at 2.

Here, after consulting with the Dictionary of Occupation Titles ("DOT") and the Selected Characteristics of Occupations ("SCO"), the ALJ concluded that Plaintiff could perform her past relevant work as a home attendant, as she actually performed it. (Tr. 25, 27). Specifically, the ALJ noted that, "[i]n comparing [Plaintiff's] [RFC] with the physical and mental demands of this work, [he found] that [Plaintiff] is able to perform it as actually performed." (Tr. 27). In making the determination, the ALJ noted that he had considered Social Security Rule 05-1c and Barnhart v. Thomas, 540 U.S. 20 (2003), to find that, while Plaintiff could not generally perform her past work because it would be "doubtful whether [Plaintiff] would be able to find other work as a PCA[3]

---

[3] The ALJ described the demands of the occupation of a PCA/home attendant as medium, semi-skilled work and cited the DOT. (Tr. 27). See DOT 354.377-014. The ALJ also reviewed the work demands of a Companion as light, semi-skilled work and Nurse Assistant. DOT 309.677-010, 355.674-014. Plaintiff testified at the October 27, 2020, administrative hearing as to the mental and physical requirements of her past work, but the vocational expert did not. (Tr. 11; see generally Tr. 48-65). Plaintiff appears to take issue with the ALJ's "lay consideration of the jobs of companion and nurse assistant as described in the DOT, without [VE Solyntjes'] input." (Plf.'s Mem., [Docket No. 23], at n. 6). However, in making a determination of whether an individual could perform their past relevant work, the ALJ may rely on the Department of Occupational Titles ("DOT") or choose to consult a vocational expert. See 20 C.F.R. § 404.1560(b)(2).

due to her lack of education, language barrier, and her past work experience as a PCA was only with her own parents in her own home," Plaintiff could actually perform her past work as a PCA because her inability to work this position only arose due to the loss of her parents or patients. Since then, there was no evidence in the record that she suffered from a new condition or sudden progression of a previous condition. (Tr. 27).

Plaintiff challenges this finding as "plainly absurd" because Plaintiff's position as a home attendant as she actually performed it in her home "no longer exists in any numbers" now that her parents have passed away. (Plf.'s Mem., [Docket No. 23], at pp. 20-21). However, when finding that a claimant can perform her past relevant work, either as she actually performed it or as it would be typically performed in the national economy, a claimant's past relevant work need not even still exist in the national economy. See Barnhart v. Thomas, 540 U.S. 20, 25-30 (2003) (finding unpersuasive the plaintiff's contention that she was disabled because her past relevant work as an elevator operator no longer existed in significant numbers in the national economy); Cribbs v. Astrue, No. 1:11–cv–654, 2012 WL 4090186, at *20 (E.D.Cal. Sept. 17, 2012) (explaining that "if a claimant is capable of performing his past work, he is not disabled, regardless of whether such work exists or is available to him" (emphasis in original) (quoting So v. Sullivan, No. 3–88–0970, 1989 WL 281939, at *3 (N.D.Cal. Oct. 30, 1989)). In other words, the ALJ was not obligated to consider whether Plaintiff could actually return to perform her past relevant work as a home attendant where, as Plaintiff contends, this position "indisputably no longer exists, in any numbers" because both of her parents are deceased rather than because of any disability of her own. See 20 C.F.R. § 404.1560(b)(3) (providing that a finding that Plaintiff could perform her past relevant work is simply a finding about what she can do, given her RFC).

18

Plaintiff alternatively argues that in evaluating whether Plaintiff's past work as a home attendant constituted past relevant work, and in particular, in evaluating her earnings, the ALJ failed to consider other factors to determine whether any portion of the payments made to her were merely a subsidy which would have weighed against a finding that her work as a home attendant constituted substantial gainful activity ("SGA") or could have rebutted the presumption of SGA. (Plf.'s Mem., [Docket No. 23], at pp. 21-24).

It is well established that a social security claimant will not be found disabled if she is engaged in SGA. See 20 C.F.R. § 404.1571. "[SGA] means work that — (a) Involves doing significant and productive physical or mental duties; and (b) Is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. For purposes of determining SGA, the Social Security Administration's primary consideration is the earnings derived from work activity. 20 C.F.R. § 404.1574(a)(1) ("We will use your earnings to determine whether you have done substantial gainful activity unless we have information from you, your employer, or others that shows that we should not count all of your earnings." Income not directly related to a claimant's productivity is not considered. 20 C.F.R. § 404.1574(a)(2). Lastly, while the SGA presumption may be rebutted by evidence of the nature of the claimant's work, the adequacy of her performance, and the time spent at work, 20 C.F.R. §§ 404.1573 and 416.973 (1988); Anderson v. Heckler, 726 F.2d 455 (8th Cir. 1984), it is the claimant who bears the burden under the Social Security Act of proving that she is disabled. See 20 C.F.R. § 404.1512(a); Whitman, 762 F.3d at 705.

Plaintiff appears to assert that, pursuant to POMS DI 10505.010(A),[4] the ALJ's concession that there was some degree of discrepancy between the amount she was paid (in excess of $34,000

---

[4] POMS DI 10505.010(A) provides the policy for determining countable earnings and subsidies. The POMS guidelines, which help Administration employees apply program regulations, do not have legal force, and do not bind the Commissioner. See Shontos v. Barnhart, 328 F.3d 418, 424 n. 7 (8th Cir. 2003) ("Although POMS guidelines do

for four years) and the value of services she provided should have weighed in favor of finding that Plaintiff was paid a subsidy, thereby rebutting SGA. (Plf.'s Mem., [Docket No. 23], at p. 22). Plaintiff also contends that, in determining whether Plaintiff was receiving a subsidy under 20 C.F.R. §§ 1573(c) and (e), the ALJ did not correctly consider and weigh the relevant factors—namely her special work conditions[5] or the time she spent working[6]—which would have also been sufficient to rebut SGA. (Plf.'s Mem., [Docket No. 23], at pp. 22-23).

The Court finds that there is substantial evidence to support the ALJ's decision that Plaintiff was engaging in SGA, and therefore, Plaintiff was unable to overcome the presumption. The ALJ considered and found that Plaintiff's work as a PCA for Supportive Home Health Care met the recency (within the past 15 years), duration (lasting for several years), and earnings requirement (earning $34,000 or more annually for a four-year period). (Tr. 25). The ALJ's analysis did not end here. See Social Security Ruling 82–62 (requiring that an ALJ "fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform her past relevant work."). He further considered whether Plaintiff was receiving a subsidy, noting that there was no evidence in the record to support that

---

not have legal force, and do not bind the Commissioner, this court has instructed that an ALJ should consider the POMS guidelines.").

[5] As to special work conditions, and in analyzing whether the claimant can perform SGA, the ALJ may consider special conditions that consider the claimant's impairment to determine the claimant's skills and abilities. 20 C.F.R. § 404.1573(c). The ALJ may determine that the claimant does not have the ability to do SGA if it is found that the claimant's work was done under special conditions. Id. Further, the ALJ may determine that the claimant is unable to do SGA if the claimant is forced to stop or reduce her work because of the removal of special conditions that were related to her impairment and essential to the work. Id. "However, work done under special conditions may show that you have the necessary skills and ability to work at the [SGA] level." Id. Such special conditions include, but are not limited to, being able to work only because of specially arranged circumstances or being given the opportunity to work despite your impairment because of the claimant's family relationship, past association with her employer, or the employer's concern for the claimant's welfare. 20 C.F.R. § 404.1573(c)(1)-(6).

[6] As for the time spent at work, Plaintiff contends that she worked "approximately three hours of 'work' per day (spread out over the day)," and failure to consider this connection with whether she was receiving a subsidy renders meaningful judicial review impossible. (Plf.'s Mem., [Docket No. 23], at p. 23). However, the regulations emphasize that, while time spent at work is an important criterion, it is not dispositive of what constitutes SGA. Id. § 404.1573(e).

the government or her employer intended to subsidize her, although she apparently had minimal oversight by her employer to ensure that she was providing her parents with the level of care necessary to justify her reported earnings. (Tr. 26). The ALJ then reviewed and cited to Plaintiff's Adult Function Reports, Work History Reports, and her hearing testimony, where she reported being on her feet most of the day, cooking, doing laundry, and helping her parents shower. (Tr. 26). The ALJ then considered Plaintiff's testimony that her son helped her with some of the heavier physical tasks, such as carrying laundry baskets and assisting her father out of bed, but the ALJ found that the record evidence supported that Plaintiff in the aggregate did almost all of the personal care work for her parents. (Tr. 26).

Thereafter, the ALJ reviewed Plaintiff's reported earnings in her July 11, 2020, Work History Assistant Tool and her detailed earnings query to specifically discuss the earning discrepancy, as highlighted by Plaintiff, noting that, while the evidence supported a finding that Plaintiff's earnings "may have been in excess of their reasonable value to some degree," it was not "a degree sufficient to rebut [SGA]." (Tr. 27). The ALJ compared her 2016 earnings average of $2,867.91 per month with the presumptive SGA for that year of $1,130 per month. (Tr, 27). Consequently, the ALJ found that Plaintiff's earnings of $2,867.91 exceeded the $1,130 per month necessary to trigger the presumption by $1,797.91. (Tr. 27). At that point in the analysis, the burden is on Plaintiff to show that 60.6% of her total income was not attributable to productivity, and therefore, should not be counted towards her income, as the ALJ noted. See 20 C.F.R. § 404.1574(a)(1) ("Generally, if you worked for substantial earnings, we will find that you are able to do substantial gainful activity."). The ALJ found, however, that Plaintiff had not met her burden to prove that more than 60% of her income should not be counted as SGA. (Tr. 27).

For all the reasons discussed above, the Court agrees.  Indeed, similar to the arguments raised above, Plaintiff is essentially asking the Court to independently re-weigh the evidence that the ALJ considered in determining whether Plaintiff engaged in SGA, and then substitute its own conclusions over those of the ALJ; this the Court cannot do. <u>Milam</u>, 794 F.3d at 983; <u>Woolf</u>, 3 F.3d at 1213.

Accordingly, the Court finds that substantial evidence supported the ALJ's conclusion that Plaintiff could not overcome the presumption that she was engaged in SGA.  <u>See, e.g.</u>, <u>Beasley v. Califano</u>, 608 F.2d 1162 (8th Cir. 1979) (finding SGA despite limits and difficulty as a part-time real estate broker).

## V. Separation of Powers

Pursuant to the separation of powers, "[t]he Constitution prohibits even modest restrictions on the President's power to remove the head of an agency with a single top officer." <u>Bhatti v. Fed. Hous. Fin. Agency</u>, 15 F.4th 848, 853 (8th Cir. 2021) (quoting <u>Collins v. Yellen</u>, 141 S. Ct. 1761, 1787 (2021)).  The Social Security Administration (hereinafter the "SSA") has a single top officer—the Commissioner of Social Security—and is an independent agency.  <u>Kaufmann v. Kijakazi</u>, 32 F.4th 843, 848 (9th Cir. 2022); <u>see</u> <u>Seila Law LLC v. Consumer Fin. Prot. Bureau</u>, 140 S. Ct. 2183, 2202 (2020).  Pursuant to statute, the Commissioner of the SSA "may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." 42 U.S.C. § 902(a)(3).

Plaintiff contends that the "SSA's structure is unconstitutional as it violates the separation of powers" by unconstitutionally limiting the President's ability to remove the Commissioner. (Plf.'s Mem., [Docket No. 23], at pp. 24-25). Defendant agrees that "§ 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove

the Commissioner without cause"; however, Defendant contends that this violation alone is an insufficient basis to order remand of the present case. (Def.'s Mem., [Docket No. 26], at p. 17).

The Eighth Circuit Court of Appeals does not appear to have addressed this issue.

In addressing this issue, this Court, as well as, other Courts in this District, have found instructive the Ninth Circuit Court of Appeals decision in Kaufmann v. Kijakazi, 32 F.4th 843 (9th Cir. 2022). In Kaufmann, the Ninth Circuit addressed § 902(a)(3)'s removal provision by applying the United States Supreme Court's reasoning in Seila and Collins. See Kaufmann, 32 F.4th at 848-49. The Kaufmann Court concluded that § 902(a)(3) is in violation of the Constitution because the SSA Commissioner is a single officer at the head of an independent administrative agency and removable only for cause. Id. The Court further determined, however, that the provision is severable because "[t]he remaining provisions of the Act are capable of fully independent function, and nothing in the text, structure, or history of the statute makes it 'evident' that Congress would have preferred, as an alternative to a Commissioner who is removable at will, no Social Security Administration at all." Id. at 849 (citing Seila, 140 S. Ct. at 2197; Collins, 141 S. Ct. at 1783).

For the same reasons discussed above and in Kaufmann, this Court finds § 902(a)(3)'s removal provision violates the separation of powers. Neither party refutes such a conclusion. The Court further finds that this removal provision is severable.

This does not end the Court's analysis. The Court must now determine the appropriate remedy for this Constitutional violation.

The Court in Collins explained that an unconstitutional removal provision does not itself affect the authority of the agency officials to act, and therefore if the agency officials served pursuant to valid appointments to their office, then "there is no reason to regard any of the actions taken by" said officials "as void." Collins, 141 S. Ct. at 1787. Instead, an individual seeking to

invalidate an agency's actions based on the existence of an unconstitutional removal provision must demonstrate that the unconstitutional removal provision caused "compensable harm."  Id. at 1788-89.

In her reply, Plaintiff contends that she suffered necessary compensable harm because she "did not receive the constitutionally valid adjudication process from SSA's [Appeals Council]" and "did not receive the constitutionally valid determination by [the Appeals Council] to which she was entitled." (Plf.'s Reply, [Docket No. 27], at pp. 4-5).  In short, Plaintiff asserts that she has suffered harm by the mere fact that Mr. Saul served as Commissioner under an unconstitutional removal provision. (See Id. at p. 8).  The Court finds Plaintiff's argument to be unpersuasive here because Collins rejected this exact argument.  See Collins, 141 S. Ct. at 1787.

Plaintiff also contends that she has demonstrated compensable harm because, but for the unconstitutional removal provision, President Biden would have removed Mr. Saul as Commissioner on the first day of his Presidency.  (Plf.'s Reply, [Docket No. 27], at pp. 6-8).  In support of this contention, Plaintiff points to President Biden's removal of Mr. Saul immediately following the day the Department of Justice confirmed the unconstitutional nature of the removal provision after the Collins decision. (Id.). Plaintiff also highlights a statement released from the White House regarding Mr. Saul's actions noting that "[s]ince taking office, Commissioner Saul has undermined and politicized Social Security benefits, . . . reduced due process protections for benefits appeals hearings, and taken other actions that run contrary to the mission of the agency and the President's policy agenda." (Id. at pp. 6-7).

Plaintiff's arguments here too are unpersuasive.  This Court has rejected the exact argument Plaintiff raises here.  See Chelsea B. v. Kijakazi, No. 21-CV-1248 (DSD/LIB), 2022 WL 3648673 (D. Minn. July 27, 2022), report and recommendation adopted, No. CV 21-1248 (DSD/LIB), 2022

WL 3647803 (D. Minn. Aug. 24, 2022); see also Gayla J. C. v. Kijakazi, No. 21-CV-1687 (TNL), 2022 WL 4017504, at *3 (D. Minn. Sept. 2, 2022).  "[T]he fact that President Biden removed the Commissioner soon after the DOJ's opinion regarding the applicability of the Collins decision to the statute at issue does not necessarily mean President Biden would have removed Commissioner Saul" any sooner than he did.  Chelsea B., 2022 WL 3648673, at *13 (citing Kathy R. v. Kijakazi, No. 2:21-cv-95 (JDL), 2022 WL 42916 at *4 (D. Me. Jan. 5, 2022)).  Moreover, the White House statement to which Plaintiff points "was attributed to a 'White House official' and not the President [himself]."  Id.

On the record now before the Court, Plaintiff has failed to demonstrate the type of compensable harm required by the Supreme Court in Collins, supra.

For the reasons discussed above, the Court concludes that the removal provision in 42 U.S.C. § 902(a)(3) violates the separation of powers, but it is severable.  Because Plaintiff has not demonstrated that the provision caused compensable harm, Plaintiff is not entitled to remand.  This finding is most in line with the Supreme Court's decision in Collins where the Court found unconstitutional a for-cause removal restriction related to a single Director of the Federal Housing Finance Agency, but it declined to undo the actions undertaken by the Director.  Collins, 141 S. Ct. at 1787.

## VI. Conclusion

The Court's review of the record as a whole indicates that the ultimate decision that Plaintiff was not disabled as defined by the Social Security Administration Act during the adjudicated period was supported by substantial evidence.  Specifically, on the Court's review of the record as a whole, the undersigned concludes that ALJ Grey's decision to discount Plaintiff's subjective complaints, ALJ Grey's RFC determination, and his decision that Plaintiff could

perform her past relevant work as a home attendant as she had actually performed it within the RFC determination was supported by substantial evidence in the record.

Therefore, based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT**:

1.    Plaintiff's Motion for Summary Judgment, [Docket No. 22], be **DENIED**; and

2.    Defendant's Motion for Summary Judgment, [Docket No. 25], be **GRANTED**.

Dated:  January 4, 2023                                                s/Leo I. Brisbois
                                                                               Hon. Leo I. Brisbois
                                                                               United States Magistrate Judge


## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).